Filed 8/5/14  P. v. Sanchez CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B246573 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA122125) |
| v. | |
| AARON SANCHEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Eleanor J. Hunter, Judge.  Affirmed.

Jonathan E. Demson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Shawn McGahey Webb and Taylor Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Following a jury trial, defendant Aaron Sanchez (appellant) was convicted of multiple felonies arising out of corporal injury to his spouse, Laura Gonzalez. Although Gonzalez did not testify at trial, out-of-court statements she made to police investigators were received in evidence. Despite appellant's repeated efforts to prevent Gonzalez from testifying at both his preliminary hearing and at trial, he appeals on the grounds he was denied his constitutional right to confront his accuser. He also contends he was denied his due process right to a fair trial because the trial court denied his motion to reopen during his attorney's closing argument, when Gonzalez unexpectedly showed up at trial. We affirm.

## FACTS AND PROCEDURAL HISTORY

### A.     Pretrial Events and Proceedings

On January 27, 2012, appellant's wife Laura Gonzalez went to a police station and reported that, during an argument two weeks earlier on January 13, appellant had thrown a pot of boiling water in her face and chest area, causing serious burns. She said appellant had warned her that, if she reported the incident to the police, he would put a screwdriver through her eyeball and/or harm or kill their oldest child. She gave the police photographs of her injuries taken three or four days after the incident.

On February 14, 2012, a detective visited Gonzalez at her home, and noticed, in addition to burn marks on her face, that one of her eyes was bruised. Gonzalez told the detective that appellant had punched her in the eye about a week earlier. She said she was at a bus stop when, "out of nowhere," appellant walked up and punched her in the eye. Gonzalez also told the detective about the incident on January 13 when appellant threw boiling water in her face.

A preliminary hearing was scheduled for April 4, 2012. On the evening of April 3 and the early morning of April 4, appellant spoke to Gonzalez on the telephone from

2

Men's Central Jail.[1] He urged her not to come to court. He also told her to hide from the officials who came looking for her by taking her children and going under the house with a blanket until they were gone. Gonzalez said that she had been "dodging" the police, but she was upset because they were looking for her son at school, and she had therefore taken him out of class. Appellant told her he was sorry, and that if she was discovered she should recant her previous statements to the police.

Gonzalez appeared in court and testified at the preliminary hearing, but she did not identify appellant as her assailant or confirm her previous statements to the police, claiming not to remember. She replied, "I don't know" or "I don't remember" to most questions asked by the prosecutor and trial counsel regarding the pending charges. After the preliminary hearing on the afternoon of April 4, appellant called Gonzalez on the phone. He told her she "did great" and thanked her for her testimony. But he said he was disappointed because she had not tried to slip out of the courthouse; had not "pled the fifth;" and did not testify that appellant was in Las Vegas at the time she was injured. Appellant called Gonzalez again later that same evening, reiterating his disappointment that she had not claimed he was in Las Vegas, and asking Gonzalez to write a notarized letter making up a story to the effect that appellant was in Las Vegas when the alleged events occurred. In the letter, Gonzalez was to "make up something" about how they had fought and she was trying to put the blame on him. Appellant asked her if she wanted him to write the letter and send it to her, and she responded, "Ok, yeah." He also talked about giving her money.

On April 14, 2012, they had another telephone conversation. Appellant reminded Gonzalez that he needed her help. She asked what she had done "to get burned in my face?" They argued about how appellant had confronted her about sleeping with his brother, and how he "cracked [her] in [her] face." Appellant neither disputed nor denied these statements by Gonzalez. On April 28, they spoke again on the phone. Appellant continued to ask Gonzalez for the letter he previously requested and indicated that he

---

**1**    The telephone conversations were recorded. They were played to the jury at trial, and transcripts were admitted into evidence and are included in the record.

3

expected her to do it for him. Gonzalez repeated a recurring concern about her children and whether they might be taken from her. Appellant said, "You care so much about your children . . . well we'll see how much you do love them. You know what I mean?" Gonzalez asked if he was threatening her and he denied that he was doing so.

By amended information filed on June 25, 2012, appellant was charged with two counts of inflicting corporal injury upon a spouse/cohabitant (Pen. Code, § 273.5, subd. (a); counts 1 & 4), one count of mayhem (§ 203; count 2), one count of dissuading a witness (§ 136.1, subd. (b)(1); count 3), and one count of misdemeanor vandalism (§ 594, subd. (a); count 5). The information alleged as to count 1 that appellant personally inflicted great bodily injury upon the victim (§ 12022.7, subd (e)). It was alleged as to counts 1 and 2 that appellant had a prior serious felony conviction (§ 667, subd. (a)(1)). It was further alleged as to counts 1 through 4 that appellant had two prior "strike" convictions (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)).[2] Appellant pled not guilty to the charges and denied the special allegations.

Jury trial was set to begin on September 24, 2012. Gonzalez was personally served with a subpoena at her apartment on September 19, 2012, requiring her to appear on the first day of trial. Gonzalez took the subpoena and said she would go to court. The next day, she and appellant had another telephone conversation. Gonzalez told him she had been served with a subpoena to appear in court. Appellant said, "[Y]ou're not going to go, right?" She responded that she did not want to go, but that they would look for her sooner or later. Appellant said that was why he needed her to stay with a friend or somewhere. He also reminded her that he needed a letter from her claiming she had made everything up; she had "just made false statements" because she did not want to be with him anymore. When Gonzalez expressed reservations, appellant threatened to "press charges" against her, and said, "You wanna play dirty with me? I'll play dirty with you . . . ."

---

[2] The information also alleged as to count 4 that appellant had a prior domestic violence conviction within the past seven years. That allegation was later stricken because the crime was more than seven years old.

4

Gonzalez did not appear for trial on September 24. The trial court issued a body attachment for her in the amount of $50,000. Sergeant Vincent Ursini with the Los Angeles County Sheriff's Department went to her home the next day with a warrant for her arrest. Gonzalez was present and provided the sergeant with paperwork showing that she had been in the hospital from September 21 to September 24, giving birth to her fifth child by Cesarean section. Gonzalez had her newborn baby with her. The sergeant was of the opinion that she was not fit to come to court and did not take her into custody.

Instead, the sergeant asked Gonzalez to telephone the prosecutor assigned to the case. According to the sergeant, during the telephone call with the prosecutor, Gonzalez "appeared to be hostile at times but somewhat cooperative. She -- when she spoke to [the prosecutor], she indicated she was going to come to court at some point but she appeared to be responsive to what [the prosecutor was] telling her and she seemed cooperative to me." The prosecutor subsequently filed a declaration in the superior court stating she had spoken to Gonzalez by telephone and Gonzalez "will be healed and in condition to appear in court on October 9, 2012." At a pretrial conference on September 26, the prosecution advised the court that Gonzalez "said she should be able in 2 weeks. If we start on the 9th, the time she will be testifying will be about 2 weeks from her surgery." The body attachment was recalled, and trial was continued to October 9.

The prosecutor's investigator went to Gonzalez's residence on October 2, 3, and 4, 2012, with a second subpoena requiring her to appear in court on October 9. No one answered the door on any of the three days.[3] The investigator tried to locate Gonzalez's teenage son at his high school, but learned that he had not attended school all week. On the morning of October 9, 2012, the investigator contacted Gonzalez's sister and learned that she had called her sister from St. Francis Hospital. The investigator returned to Gonzalez's apartment on October 9 and 10, but no one was there. She called the hospital on October 12, and learned that Gonzalez was not registered as a patient. Robert Maus, a supervising investigator with the Los Angeles District Attorney's Office, testified he

---

[3] Apparently, an investigator for appellant's attorney was able to contact Gonzalez on October 2, and got a statement from her.

went to arrest Gonzalez on October 9, 10, and 11, pursuant to the body attachment issued by the court, but no one answered the door. On October 9 and 10, there was furniture in the apartment, but Gonzalez's car was gone. Maus returned to the apartment at 5:30 a.m. on October 11, but no one answered the door. When he returned to the apartment at 2:30 that afternoon, all the furniture had been moved out and the apartment was vacant. Gonzalez's neighbor told the investigator that they had moved out that day.

## B. Jury Trial

Jury trial commenced on October 11, 2012. The next day, the prosecutor moved to admit Gonzalez's preliminary hearing testimony under the former testimony exception to the hearsay rule because the prosecution was unable to secure her appearance and she was unavailable as a witness. (Evid. Code, § 240, subd. (a)(5), § 1291, subd. (a)(2).) After hearing arguments from counsel, the court found the prosecution had exercised due diligence in attempting to locate and produce Gonzalez as a witness, and that she was unavailable for purposes of admitting her former testimony from the preliminary hearing. The court commented that Sergeant Ursini could have arrested her on September 25, since the body attachment was not quashed at that point. It also stated, "There was no need to resubpoena the victim, because she had already been subpoenaed to come to court, based on her representations that she would be cooperative." The court pointed out that the prosecution team "didn't stop there," but had continued to look for Gonzalez at various times of the day on different days when it became apparent that she was evading service.

Because the trial court determined that Gonzalez was unavailable, it allowed her preliminary hearing testimony to be read to the jury. The prosecution then sought to admit Gonzalez's previous out-of-court statements to the police investigators as prior inconsistent statements under Evidence Code section 1235 and also under the "forfeiture-by-wrongdoing" doctrine pursuant to section 1390. The court concluded that Gonzalez's testimony at the preliminary hearing -- where she claimed not to remember what had occurred, how she had gotten burned, or what she had told the police -- was not truthful. The prosecution was allowed to present evidence of her out-of-court statements to the

6

police investigators which identified appellant as her assailant, overruling appellant's hearsay objections on the grounds the statements were admissible as prior statements inconsistent with Gonzalez's testimony at the preliminary hearing, pursuant to section 1235. The court also admitted the statements pursuant to section 1390.[4]

## C.     Closing Arguments and the Motion to Reopen

Both sides rested and the prosecutor concluded her closing argument. Soon after defense counsel had begun her closing argument, Gonzalez entered the courtroom, accompanied by her children. Defense counsel immediately requested a sidebar and moved to reopen the evidence to allow Gonzalez to testify. The jury was sent out. The court ordered Gonzalez to step forward, and placed her in custody. A thirty-minute recess was taken, after which the parties returned to the courtroom. Outside the presence of the jury, defense counsel argued that reopening the case so Gonzalez could testify was in the interest of justice and due process so that "this jury can actually hear . . . additional information, actually hear from the complaining witness, the woman who has repeatedly been called the victim in this case. They can hear from her themselves, see her demeanor in court, and evaluate her credibility fully, now that she's physically available to the court in the proceedings." However, the record reveals no offer of proof by defense counsel regarding the nature of what Gonzalez would say if allowed to testify.

The prosecution took no specific position on the defense motion, leaving it to the trial court's discretion. But it expressed doubts that the defense had "made the proper showing to allow them to reopen." The court indicated its belief, based upon what took place in the courtroom, that defense counsel had nothing to do with Gonzalez's sudden

---

**4**     To the extent the record may have been unclear regarding the court's ruling on the forfeiture-by-wrongdoing doctrine, after the verdict the court clarified that the prior out-of-court statements to police were admitted under both Evidence Code section 1235 and section 1390.

appearance.[5]  However, the court stated appellant was "up to his neck with regard to her not coming to this proceeding."  The court stated there was no violation of due process because appellant "knew exactly what he was doing throughout this whole process."  It noted appellant had been in contact with Gonzalez and had previously encouraged her to hide and not come to court to testify, and it referred to the offer of money by appellant to Gonzalez during one of the phone calls.  The court stated appellant may have had "buyer's remorse" when he realized it might have been better if she had come to testify at trial.  Convinced that Gonzalez's late appearance was the appellant's handiwork, the court stated that "in the interest of justice, I'm going to deny [the] motion [to reopen.]"

### D.     Verdict, Sentencing, and Motion for New Trial

The jury convicted appellant of inflicting corporal injury (counts 1 & 4) and found the great bodily injury allegation to be true.  The jury acquitted appellant of mayhem and dissuading a witness (counts 2 & 3).[6]  Appellant admitted the prior serious felony and prior strike conviction allegations.  The trial court denied probation and sentenced appellant to a total state prison term of 30 years to life, consisting of 25 years to life on count 1, plus five years on the great bodily injury enhancement.  The court imposed concurrent terms of five years on count 4 and one year on count 5.  Appellant was given 399 days of presentence custody credit.

Appellant filed a new trial motion arguing, inter alia, the denial of his motion to reopen violated his constitutional right to due process.  At appellant's sentencing hearing,

---

**5**      We have no reason to question the trial court's conclusion that defense counsel was unaware Gonzalez would arrive unexpectedly in the middle of her closing argument. However, we note that shortly after it occurred and the court expressed its surprise, defense counsel stated, "I was informed by family this morning that they had contacted her."  Thus, it appears there was contact between appellant's side and Gonzalez prior to her arrival in court.

**6**      During trial, appellant pled no contest to the misdemeanor vandalism charge (count 5), but continued to contest the remaining charges.

8

the court denied the new trial motion, reiterating its view that appellant had orchestrated the timing of Gonzalez's appearance in court: "I do believe it was contrived, that all of a sudden the victim shows up with all the children, for the sympathy factor. And I believe Mr. Sanchez--I think there's a strong inference to be made that he was behind all of that. [¶] So based on all of that, I don't think the defendant has a place to be able to complain of injustice, when he actually caused it. He can't complain that he had no opportunity to cross-examine the victim, when in fact he was the cause of her being unavailable, in the court's humble opinion. Or at least a cause. Maybe there were multiple causes, but he certainly had a significant impact. [¶] I had indicated at the time I thought the defendant was making a mockery of the whole system by parading his family in, for whatever purposes, and I still hold to that belief."

Appellant filed a timely notice of appeal from the judgment.

## DISCUSSION

### A.      Relevant Law and Standard of Review

The Sixth Amendment's confrontation clause, applicable in state prosecutions by the Fourteenth Amendment of the United States Constitution, and California's constitutional confrontation clause, guarantee a criminal defendant the right to confront, i.e., cross-examine, the prosecution's witnesses. (*Chambers v. Mississippi* (1973) 410 U.S. 284, 295; *People v. Herrera* (2010) 49 Cal.4th 613, 620-621 (*Herrera*).) The constitutional right to confront the prosecution's witnesses does not impose an absolute requirement that a witness testify at trial against a defendant. An exception to confrontation at trial is allowed when a witness is unavailable at the time of trial and has given testimony against the same defendant at a previous judicial proceeding and was subject to cross-examination. (*Herrera*, at p. 621.) Accordingly, the preliminary hearing testimony of an unavailable witness may be admitted at trial without violating the defendant's constitutional right of confrontation. (*Ibid.*)

California's statutory provisions are in accord.  Evidence Code section 240 parallels the constitutional guarantee and provides that a witness is unavailable when he or she is "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process."  (*Id.*, subd. (a)(5).)  As long as " 'substantial good faith efforts' " are undertaken to locate a witness, the fact that " 'additional efforts might have been made or other lines of inquiry pursued' " does not indicate lack of diligence, because " '[t]he law requires only reasonable efforts, not prescient perfection.' [Citation.]"  (*People v. Diaz* (2002) 95 Cal.App.4th 695, 706 (*Diaz*).)  "The constitutional and statutory requirements are 'in harmony.' [Citation.]"  (*People v. Smith* (2003) 30 Cal.4th 581, 609.)  Since hearsay testimony is in large part "unconfronted," the overlap between the constitutional right of confrontation and the evidentiary rules regarding hearsay comes as no surprise.  Indeed, " '[i]t seems apparent that the Sixth Amendment's Confrontation Clause and the evidentiary hearsay rule stem from the same roots.' " (*Giles v. California* (2008) 554 U.S. 353, 365 (*Giles*).)  Unavailability of a witness is often necessary to support an exception to the hearsay rule.  (See, e.g., §§ 1230, 1291, 1390.)

For purposes of the constitutional right of confrontation, a witness is considered "unavailable" when the prosecution has made a good-faith effort to secure his or her presence at trial.  (See *Ohio v. Roberts* (1980) 448 U.S. 56, 74 (*Ohio*), overruled on other grounds by *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*).)  As the Supreme Court explained in *Ohio*, "The lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness.  [Citation.]  The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness.  As with other evidentiary proponents, the prosecution bears the burden of establishing this predicate."  (*Ohio*, at pp. 74-75.)

However, where a defendant engages in wrongdoing that was intended to, and did, procure the unavailability of the witness, the right to confrontation may be forfeited.  This so-called "forfeiture-by-wrongdoing" reflects the recognition that " 'one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation.'

10

[Citation.]" (*Giles*, *supra*, 554 U.S. at p. 373.) As the United States Supreme Court stated in *Giles*: " 'The Constitution gives the accused the right to a trial at which he should be confronted with the witnesses against him; but if a witness is absent by his own wrongful procurement, he cannot complain if competent evidence is admitted to supply the place of that which he kept away . . . . [The Constitution] grants him the privilege of being confronted with the witnesses against him; but if he voluntarily keeps the witnesses away, he cannot insist on his privilege.' " (*Id.* at p. 372.)

This principle was also expressed in *Davis v. Washington* (2006) 547 U.S. 813, 833, where the high court explained that "when defendants seek to undermine the judicial process by procuring or coercing silence from witnesses and victims, the Sixth Amendment does not require courts to acquiesce." The forfeiture rule removes the incentive for defendants to intimidate witnesses against them -- in other words, "it is grounded in 'the ability of courts to protect the integrity of their proceedings' " (*Giles*, *supra*, 554 U.S. at p. 374, quoting *Davis*, at p. 834) and "extinguishes confrontation claims on essentially equitable grounds" (*Crawford*, *supra*, 541 U.S. at p. 62).

As far as our standard of review, we review the trial court's resolution of disputed factual issues under the deferential substantial evidence standard. (*People v. Cromer* (2001) 24 Cal.4th 889, 902 (*Cromer*).) But we review whether the facts demonstrate prosecutorial good faith and due diligence de novo. (*Herrera*, *supra*, 49 Cal.4th at p. 623.) We review the court's ruling on whether to grant a motion to reopen the evidence for an abuse of discretion. (*People v. Ayala* (2000) 23 Cal.4th 225, 282 (*Ayala*); *People v. Jones* (2003) 30 Cal.4th 1084, 1110 (*Jones*).)

**B.      Admissibility of Gonzalez's Out-of-court Statements to Police Investigators**

1.      *Gonzalez's unavailability as a witness at trial*

As noted above, Evidence Code section 240, subdivision (a)(5) provides that a witness is unavailable when he or she is "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process." The Sixth Amendment requires a reasonable,

11

good-faith effort to secure the witness's presence.  (*Ohio*, *supra*, 448 U.S. at p. 74.)  Due diligence connotes persevering application, untiring efforts in good earnest and efforts of a substantial character.  (*Herrera*, *supra*, 49 Cal.4th at p. 622; *People v. Valencia* (2008) 43 Cal.4th 268, 292.)  "Considerations relevant to the due diligence inquiry 'include the timeliness of the search, the importance of the proffered testimony, and whether leads of the witness's possible location were competently explored.' [Citation.]" (*Herrera*, at p. 622; accord, *Valencia*, at p. 292.)  As explained in part A above, the law requires " 'only reasonable efforts, not prescient perfection.' [Citation.]" (*Diaz*, *supra*, 95 Cal.App.4th at p. 706.)  So long as good-faith efforts are undertaken to locate a witness, the fact that " 'additional efforts might have been made or other lines of inquiry pursued' " does not indicate a lack of the requisite due diligence necessary to support a finding of the unavailability of a witness.  (*Ibid*.)

Since the material facts regarding the conduct of the prosecution in attempting to have Gonzalez testify at trial are not in significant dispute, we independently determine whether they demonstrate prosecutorial good faith and due diligence.  (*Herrera, supra*, 49 Cal.4th at p. 623.)  Gonzalez's failure to appear at trial must be seen in the context of appellant's efforts to prevent her from appearing at the preliminary hearing (where she ultimately did, reluctantly, appear) and his subsequent efforts to discourage her from appearing at trial.  It is undisputed that Gonzalez was served with a subpoena on September 19, 2012, commanding her appearance at trial on September 24.  When she failed to appear, the prosecution began looking for her.  When they found out she had given birth, they appropriately backed off.  But they asked her when she would be able to testify and she said she would be able to go to court by October 9.  In light of that apparent cooperation, she was not taken into custody and the body attachment was held to October 9.  The court pointed out there was no need to resubpoena her, because she had already been subpoenaed to come to court and represented that she would cooperate.  Indeed, she herself had discussed a two-week delay with the prosecuting attorney, and the trial was continued to October 9 on that basis.

Nevertheless, further efforts to serve Gonzalez with a subpoena took place on October 2, 3, and 4. They were unsuccessful – even though appellant's investigator was apparently able to obtain a statement from her in that time period. Efforts to find her teenage son at school were also unsuccessful, since Gonzalez had taken him out of school. After Gonzalez failed to appear on October 9, the prosecutor's agents went to her home on multiple occasions looking for her. Eventually, they discovered she had moved out.

The prosecution made reasonable, good-faith attempts to procure Gonzalez's attendance in court, clearly sufficient to pass muster under both the federal and state Constitutions and Evidence Code section 240. This is especially so since the witness, in conjunction with appellant and at his behest, was evading service of process and dodging prosecutors in order to avoid having to come to court. The question of whether a prosecutor's efforts were sufficiently diligent presents a mixed question of law and fact (*Cromer*, *supra*, 24 Cal.4th at p. 893) and it is reasonable to consider whether the witness purposely made herself unavailable (*Diaz*, *supra*, 95 Cal.App.4th at p. 706). Here, appellant spoke to Gonzalez on September 20, the day after she received the subpoena, and said, "[Y]ou're not going to go, right?" He said he needed her to stay with a friend or somewhere, as opposed to her own home.[7] Where a party tries to prevent a witness from coming to court to testify, it ill-behooves him to claim prosecutors did not do enough to procure her presence.

There was no error in the trial court's finding that Gonzalez was unavailable to testify at trial.

---

[7] Gonzalez repeatedly asserted in her telephone conversation with appellant that her primary concern was for her children, and that they not be taken away from her. In the initial conversation with police investigators, Gonzalez said appellant warned her that if she reported the incident to police he would, among other things, harm or kill their oldest child. In the telephone conversation of April 28 (over three weeks after the preliminary hearing), Gonzalez asked if appellant was threatening her when he said, "You care so much about your children . . . well we'll see how much you love them. You know what I mean?"

2. *Admissibility of the statements made to police investigators as prior inconsistent statements*

Despite the detailed allegations Gonzalez made to police investigators in January and February 2012, she testified at the April 4 preliminary hearing and claimed she could not recall what she had told the police. She said "I don't know" or "I don't remember" in response to virtually all questions about the events surrounding her burned face and black eye. Normally, the testimony of a witness that he or she does not remember an event is not inconsistent with that witness's prior statement describing the event. (*People v. Cowan* (2010) 50 Cal.4th 401, 463, citing *People v. Green* (1971) 3 Cal.3d 981, 988-989.) However, when a witness's claim of lack of memory amounts to deliberate evasion, inconsistency is implied. (*Cowan*, at p. 463.) If there is a reasonable basis in the record for concluding that the witness's "I don't remember" statements are evasive and untruthful, admission of his or her prior statements is proper. (*People v. O'Quinn* (1980) 109 Cal.App.3d 219, 225; accord, *Cowan*, at p. 463.) Since the trial court found Gonzalez was not being truthful when she testified to her lack of memory, it allowed the prosecution to admit her prior inconsistent statements to the police under Evidence Code section 1235.[8]

On appeal, appellant claims this was error – not because the court improperly applied Evidence Code section 1235, but because the court improperly admitted the preliminary hearing testimony with which the prior statements were inconsistent. Since we find the admission of the preliminary hearing testimony to have been proper, we reject appellant's argument in this regard, and find no error in the court's ruling that the prior statements to police were admissible.

---

[8] The Law Revision Commission comments to Evidence Code section 1235 state it "will provide a party with desirable protection against the 'turn-coat' witness who changes his story on the stand and deprives the party calling him of evidence essential to his case." (Cal. Law Revision Com. com., 29B pt. 4 West's Ann. Evid. Code (1995 ed.) foll. § 1235, p. 225.)

3. *Admissibility of the statements made to police investigators under the forfeiture-by-wrongdoing doctrine*

As noted above, one who procures the absence of a witness by wrongdoing forfeits the constitutional right to confrontation. (*Giles*, *supra*, 554 U.S. at p. 374.) Forfeiture-by-wrongdoing is applicable by statute to the circumstances of this case.[9] California Evidence Code (Article 17 – Physical Abuse) includes section 1390, which provides an exception to the hearsay rule "if the statement is offered against a party that has engaged, or aided and abetted, in the wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." (§ 1390, subd. (a).)

In the instant case, the trial court was convinced that appellant was "up to his neck with regard to [Gonzalez] not coming [to trial]." There was substantial evidence that appellant engaged in wrongdoing intended to procure her unavailability. Appellant points out he was unsuccessful in that regard as to the preliminary hearing, and his efforts to have Gonzalez provide an exculpatory letter for him also failed. He contends the prosecution failed to prove he *did* cause her absence from trial, claiming it was "most likely to have been the result of follow-up medical procedures, her frail condition, and her substantial childcare burdens." But there is no evidence in the record that any of these things caused Gonzalez's failure to appear for trial. And it is unlikely they would have caused her to suddenly move out of her home just as the trial was about to begin.

On the other hand, there was substantial evidence appellant was engaged in repeated attempts to prevent Gonzalez from testifying, involving discussions of money and even potential harm to her children. During most of the telephone conversations between appellant and Gonzalez, she expressed a desire to cooperate with him and not testify in court.

---

[9] The Federal Rules of Evidence also provide an exception to the hearsay rule as to "[a] statement offered against a party that wrongfully caused – or acquiesced in wrongfully causing – the declarant's unavailability as a witness, and did so intending that result." (Fed. Rules of Evid., rule 804(b)(6).)

15

The burden is on the prosecutor to establish by a preponderance of the evidence that appellant "engaged, or aided and abetted, in the wrongdoing that was intended to, and did, procure" Gonzalez's unavailability as a witness. (Evid. Code, § 1390, subd. (a).) Here, that burden was met because a preponderance of the evidence -- if not the only evidence -- before the trial court was that appellant engaged in repeated efforts intended to make Gonzalez unavailable, and in the absence of any evidence to the contrary, the compelling inference is that his conduct did procure her unavailability. Certainly, the trial court's finding that appellant was "up to his neck with regard to [Gonzalez's] not coming to this proceeding" and that he "knew exactly what he was doing throughout this whole process" is supported by substantial evidence. And its conclusion that appellant "can't complain that he had no opportunity to cross-examine the victim, when in fact he was the cause of her being unavailable, in the court's humble opinion . . ." fairly paraphrases the forfeiture-by-wrongdoing doctrine.

We find no error in the court's ruling that Gonzalez's statements to police investigators were admissible as an exception to the hearsay rule under Evidence Code section 1390.

## C.     The Denial of Appellant's Motion to Reopen

Appellant also claims the trial court erred in denying his motion to reopen when Gonzalez arrived unexpectedly in court with her children early in defense counsel's closing argument. We disagree. Appellant had repeatedly implored Gonzalez not to come to court to testify. As noted, prior to the preliminary hearing he advised her to hide under the house on a blanket with her children to avoid the police. He suggested she slip out of the courtroom before she was called as a witness, or "take the fifth." As to the trial, appellant implored her not to go to court, suggesting that she leave home and stay with a friend. But after the family was in contact with her near the end of trial, Gonzalez unexpectedly appeared in court. The defense argued that in the interest of justice and due process the jury should now hear from this key witness. Despite appellant's multiple

16

prior efforts to keep her away, suddenly Gonzalez "was too important a witness to exclude her testimony. . . ."

A motion to reopen is allowed under Penal Code section 1094 and is " 'addressed to the [trial] court's sound discretion.' [Citation.]" (*People v. Homick* (2012) 55 Cal.4th 816, 881 (*Homick*).)  It is therefore reviewed on appeal for an abuse of discretion. (*Ayala*, *supra*, 23 Cal.4th at p. 282; *Jones*, *supra,* 30 Cal.4th at p. 1110.)  In making this assessment, we consider four factors:  (1) the stage the proceedings had reached when the motion was made; (2) the defendant's diligence (or lack thereof) in presenting the new evidence; (3) the prospect that the jury would accord the new evidence undue emphasis; and (4) the significance of the evidence.  (*Jones*, at p. 1110*.*)

As to factor 1, appellant makes the point that a motion to reopen, by its nature, often comes late in the proceedings.  After all, it would not be a motion to reopen unless the evidence had already closed.  Still, one looks not only to the timing but the circumstances in which such motions are made.  Following repeated attempts by appellant to prevent Gonzalez from testifying, the family contacted her and she appeared unannounced -- after the prosecutor had finished her closing argument, but near the beginning of defense counsel's closing.  The trial court found the circumstances to be suspect, and concluded that the arrival was contrived.  This was a reasonable inference under the circumstances.  As to factor 1, the evidence supports the court's exercise of discretion to deny the motion to reopen.

As to factor 2, a defendant's due diligence (or lack thereof) in locating a missing witness or discovering new evidence is relevant to the issue of whether the court abused its discretion in denying a motion to reopen. (*People v. Green* (1980) 27 Cal.3d 1, 42; accord, *People v. Funes* (1994) 23 Cal.App.4th 1506, 1521.)  But if there was any diligence on appellant's part, it was in his attempts to *prevent* Gonzalez from testifying. The diligence referred to here relates to efforts made to present new evidence, not diligence in precluding it.

As to factor 3, most of the substantive evidence at trial came in through statements made by Gonzalez prior to trial (either read to the jury or related by others), combined

17

with the conversations between her and appellant over the phone.  Both sides rested, the jury was instructed, the prosecution had completed its summation and the defense's closing had begun.  If the evidence was unexpectedly reopened and Gonzalez was now allowed to testify in open court, a jury may well afford this dramatic turn of events undue emphasis, when compared to the presentation of the earlier evidence.

Finally, as to factor 4, there is no basis for finding that Gonzalez's testimony would have been significant in terms of assisting appellant.  Appellant cites *People v. Frohner* (1976) 65 Cal.App.3d 94 to support his position, but that case is inapposite.  In *Frohner*, the defendant had wanted a missing witness to appear all along, and the appellate court found that the prosecutor had failed to make reasonable efforts to locate him.  (*Id.* at p. 111.)  Here, we have the opposite situation:  The prosecutor made reasonable efforts to locate Gonzalez, and was unsuccessful in large part because appellant did not want her to testify.  Appellant cannot reasonably argue Gonzalez had significant testimony he needed to present at trial, when the record shows he himself was trying to prevent her from coming to court.

Appellant's reliance on *People v. Riley* (2010) 185 Cal.App.4th 754 (*Riley*) also misses the mark.  In *Riley*, the trial court granted a prosecution motion to reopen because it had inadvertently left out evidence of what was a "usable amount" of a controlled substance.  (*Id.* at p. 757.)  It was clear what the proffered testimony would be, and the court properly exercised its discretion in granting the motion to reopen.  (*Ibid.*)  Here, appellant did not indicate what Gonzalez's proffered testimony would be, and the trial court justifiably denied the motion in its discretion.  *Riley* hardly supports appellant's position.

Implicit in appellant's argument is that Gonzalez had something significant to add, so as to justify reopening after the close of evidence.  For example, in *Homick*, defendant sought to reopen on the grounds he would present new evidence that the gun recovered by police was not the murder weapon.  (*Homick*, *supra*, 55 Cal.4th at pp. 880-881.)  In *Jones*, defendant asked to reopen in order to lay an adequate foundation for photographs, which he had inadvertently failed to do prior to closing.  (*Jones*, *supra*, 30 Cal.4th at

pp. 1110-1111.)  And in *Riley*, the goal was to present specific evidence that had been left out through inadvertence.  (*Riley*, *supra*, 185 Cal.App.4th at p. 765.)  Here, the record is devoid of any indication as to what Gonzalez would have testified if called as a witness.[10]  There is no basis to conclude that if the motion to reopen had been granted, Gonzalez's testimony would have been significant in terms of aiding appellant's defense.

The trial court acted within its discretion in denying appellant's motion to reopen the evidence.

**D.  Even if the Trial Court's Rulings Had Been Erroneous, They Were Not Prejudicial**

Even if we were to accept appellant's position as to errors by the trial court, there would be no grounds to reverse the judgment.  The California Constitution states, "No judgment shall be set aside, or new trial granted, in any cause, on the ground of . . . any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."  (Cal. Const., art. VI, § 13.)  This constitutional provision is reflected in legislative enactments.  For example, "[n]either a departure from the form or mode prescribed by this code in respect to any pleading or proceeding, nor an error or mistake therein, renders it invalid, unless it has actually prejudiced the defendant, or tended to his prejudice, in respect to a substantial right."  (Pen. Code, § 1404.)  An appellate court "must give judgment without regard to technical errors or defects, or to exceptions, which do not affect the substantial rights of the parties."  (Pen. Code, § 1258.)

As our Supreme Court explained in the seminal case of *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*), determining if an error is reversible or nonreversible "requires a . . . determination whether the defendant has been prejudiced, and the final test is the 'opinion' of the reviewing court, in the sense of its belief or conviction, as to the effect of

---

[10]  While defense counsel argued the jury should hear "additional information" from the complaining witness, she gave the court no indication of the nature of that additional information or its significance.

19

the error; and that ordinarily where the result appears just, and it further appears that such result would have been reached if the error had not been committed, a reversal will not be ordered." (*Id.* at p. 835.) Put another way, a "miscarriage of justice" should be declared "only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Id.* at p. 836.)

As regards Gonzalez's preliminary hearing testimony, she claimed not to know or remember the details of the crimes, and said she could not recall why she went to the police with her accusations. By itself, this testimony was not harmful to appellant's case; indeed, later that day he thanked her for it. To the extent the preliminary hearing testimony provided the basis for the admission of Gonzalez's prior inconsistent statements to the police, the court's ruling was harmless beyond a reasonable doubt because those statements were admissible in any event under Evidence Code section 1390, subdivision (a), since any objection based upon a violation of the confrontation clause was forfeited by wrongdoing. (*Giles*, *supra*, 554 U.S. at p. 374.)

Nevertheless, appellant contends there was prejudice from the erroneous admission of Gonzalez's out-of-court statements to police because there was "simply no other direct evidence tying appellant to Gonzalez's injuries." He says that "[a]t no time in any of the recorded phone calls from jail does appellant ever admit to any of the alleged conduct underlying the spousal injury charges." But the transcripts of the phone calls tell a different story.[11]

In one phone conversation, Gonzalez confronted appellant about the incidents where he had burned her face with boiling water and had "cracked" her in her face. Instead of denying her allegations, appellant made efforts to prevent her from testifying about what happened. He expressed his gratitude for her claim at the preliminary hearing that she recalled nothing about the episodes or her statements to police. He tried to

---

[11] Appellant does not claim it was error for the court to admit the telephone calls or their transcripts into evidence.

convince her to make up a story claiming she had lied to police because she no longer wanted to be with him, and beseeched her to sign a notarized letter to that effect. And he made repeated requests for her to falsely claim he was in Las Vegas during the time of the events – not to mention his offers of money and veiled threats to the safety of their children. At no time does he deny throwing boiling water at his wife or "crack[ing]" her in the face. Nor does he say anything that implies the accusations were not true. The prosecutor argued to the jury that "[t]hose are not the words of an innocent man," and that appellant's "own words convict him."[12] The phone conversations provide powerful evidence, separate and apart from Gonzalez's out-of-court statements to the police, from which a jury could have found beyond a reasonable doubt that appellant had committed the acts alleged.[13]

As regards the denial of his motion to reopen once Gonzalez appeared in the courtroom, appellant contends this ruling was prejudicial to his constitutional right of due process. But even if we were to conclude that the trial court had abused its discretion in denying the motion, there is no reason to believe the outcome would have been different if Gonzalez had been allowed to testify. With no offer of proof as to the nature of her proposed testimony, one is left to speculate about what she might have said. There is nothing in the record to suggest that her testimony would have created a reasonable probability that a result more favorable to the appellant would have been reached. (*Watson*, *supra*, 46 Cal.2d at p. 836.)

Thus, even if the challenged rulings had been erroneous, on the record before us they would have been harmless beyond a reasonable doubt.

---

[12] The court instructed the jury on adoptive admissions. (CALCRIM No. 357.)

[13] Even in cases where there is substantial error, a judgment will not be reversed where a defendant's guilt is so clearly established by the evidence that the same result would have been reached if the error had not been committed. (6 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Reversible Error, § 1, p. 512, § 55, pp. 586-587.)

**E.      Summary**

The trial court did not err in admitting into evidence Gonzalez's out-of-court statements to the police, nor did it err in denying appellant's motion to reopen the evidence after both sides had rested.  Even if there had been error in either of these rulings, under the circumstances they would not have been prejudicial and reversal of the judgment would not be warranted.

## DISPOSITION

The judgment of the trial court is affirmed.

KUSSMAN, J. [*]

We concur:

BIGELOW, P. J.

FLIER, J.

---

[*]      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.